**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Sam GENTRY, Wayne Young, William Hadley, Carolyn Dalton and Walter Nichols, Defendants–Appellants.**

No. 87–3102.

United States Court of Appeals, Fifth Circuit.

March 2, 1988.

Rehearing and Rehearing En Banc Denied April 5, 1988.

Ralph S. Whalen, Jr., New Orleans, La., for Gentry and Hadley.

H.R. Alexander, J.F. Garcia, III, Mandeville, La., for Young.

Dominick M. Tamburo, III, New Orleans, La., for Nichols.

Anthony R. Crouse, New Orleans, La., for Dalton.

Douglas N. Frazier, Curtis Collier, Fred P. Harper, Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before CLARK, Chief Judge,
BRIGHT* and GEE, Circuit Judges.

GEE, Circuit Judge:

Defendants Nichols, Dalton, Gentry and Hadley appeal their conviction of knowingly and intentionally conspiring to possess marijuana with intent to distribute it. Defendant Young appeals his broader conviction for activity related to the same drug transaction. For the reasons stated, we affirm the conviction of each.

*Facts*

As with many conspiracy appeals, we are obliged to commence with a lengthy recitation of the facts. One of his relatives having nearly died from cocaine abuse, David Ard decided to straighten himself out. He pledged to terminate his own abusive use of the drug, and he agreed to cooperate with Federal drug agents in their attempt to arrest Wayne Young, a drug distributor with whom Ard had dealings. Ard's assistance was not entirely altruistic; he was paid about $5,000 before trial as reimbursement for his expenses, information, and continuous assistance.

Ard made several phone calls to Young, recorded under the supervision of Agents Todd and Enders. The agents had decided to perform a "reverse buy" operation, one in which they would provide a large amount of marijuana to Young in exchange for a large amount of cash and cocaine. Ard facilitated arrangement of the operation in a telephone conversation with Young on July 22, 1986; informing Young that he had found a source for Young's scheme to trade cocaine for marijuana, he introduced Young to Agent Todd over the phone. After several conversations and meetings between Young and Agent Todd in the following week, the exchange was arranged: Agent Todd and a couple of associates would deliver eleven bales (500 pounds) of marijuana to Young's residence at 1:00 p.m. on August 1, 1986; Young and several buyers would be present to pool their cash resources in order to make the purchase.[1]

Agent Todd called Young at 9:00 a.m. on August 1st to verify that the transaction would occur. At 1:10 p.m., Agent Todd called again to inform Young that he would be late. Young indicated in the conversation that he had $50,000 present at that time but that he "should have way more than that by the time you get here." Agents Todd and Enders arrived at the farm residence in an undercover vehicle between 2:30 p.m. and 3:00 p.m. The undercover vehicle's trunk contained two bales of marijuana. A large recreational vehicle followed behind, ostensibly containing the remainder of the marijuana bales but in fact carrying uniformed agents to assist in the arrests.

Young told the agents that not all of the expected purchasers had arrived. Many of them, however, were already present and had contributed to the money that Young showed to Agent Todd.[2] Young and these others were arrested when Young carried one of the marijuana bales away from the

---

* Circuit Judge of the Eighth Circuit, sitting by designation.

1. On a visit to Young's residence on July 25th, Young gave Agent Todd a sample from what was represented to be three kilograms of cocaine. The cocaine was initially going to be 50 percent of the collateral in the transaction. Young informed Agent Todd by phone on July 30th that the exchange would be for cash only.

   During the tour of Young's residence on July 25th, Young stated that he would not have all the money in one place to hand over. Rather, several of the buyers would be waiting in his barn, hidden from Agent Todd. Young said he would take the marijuana to the barn and bring

the money back. At a meeting between Young, Agent Todd and several other agents on July 31st, Young again indicated that several buyers who would be at his house on the day of the delivery would provide cash for the transaction. Agent Todd testified that Young was *not certain* that all money would be present at 1:00 P.M., but that "eventually during that day he should have enough money for the marijuana."

2. After entering plea bargains, eleven participants pled guilty to the charge of knowingly and intentionally conspiring to possess with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1).

undercover vehicle. The search warrant that had been issued that morning was executed; and a search for weapons, drugs, and currency ensued.

At the time of making arrests, Agent Todd instructed two officers to wait at the property entrance. Several reasons underlay his decision to secure the site: when arrests were made, a few individuals successfully fled; in addition, Young had told Agent Todd that more purchasers would be arriving and phone calls to the residence after Young's arrest verified Young's statements. Troopers stationed at the entrance were ordered to make inquiries of each visitor and to search persons and vehicles for money, weapons, and drugs. The entrance to the property was more than a half-mile from the residence area where the initial arrests occurred.

The officers controlling the entrance detained every visitor. Those who did not have large amounts of cash or weapons and who offered legitimate reasons for visiting were released.

Defendants Dalton and Nichols arrived in a red Dodge Daytona. They were detained immediately upon entering the property. One trooper, Cade Blades, led them down the driveway closer to the residence so as to remove them from the sight of other approaching vehicles. He obtained identification from the defendants, and the driver, Carolyn Dalton, consented to a search of the vehicle by executing a Consent to Search form. As Trooper Blades approached the vehicle, Dalton notified him that she had placed her loaded .38 revolver under the driver's seat. Trooper Blades found a large sum of money under the passenger seat and two guns in addition to the one that Dalton had mentioned. He asked Dalton and Nichols to whom the property belonged, and Dalton claimed them.[3]

At 5:30 p.m., Trooper Cowart followed a Cadillac as it entered the property. The vehicle pulled off to the side of the driveway. As Officer Cowart drove up behind the Cadillac, the driver shifted his car in reverse, butting Cowart's truck, and then attempted to move forward and to the left. Officer Cowart hopped from his truck and drew his weapon on the vehicle. Defendants Hadley and Gentry, and the state's witness, Baudoin, were ordered to get out and put their hands on top of the vehicle. Hadley had no identification on him but said he had a checkbook in the vehicle. A search for defendant Hadley's identification in the vehicle led to the discovery of a .9 mm automatic pistol.[4] About $5,000 was found on Isaac Baudoin and $500 on defendant Gentry.

### *Discussion*

#### I. Search of the Vehicles

##### A. The Scope of the Search Warrant

■ On August 1, 1986 at 9:30 a.m., United States Magistrate Alma Chasez issued a warrant permitting, at Young's rural address, the search of "a brown wood frame cedar residence, adjacent swimming pool with small sheds at either end, adjacent barn (red in color), with adjoining shed and surrounding grounds."[5] The property listed in the warrant included "controlled substances, vehicles or packaging materials used to package and transport controlled substances...." The search was required to occur on or before August 4, 1986. The magistrate did not specify at what time of day the search had to be made.

Defendants assert several violations of the warrant by the searching troopers. First, they contend that vehicles owned by visitors on the property were not covered by the warrant. This assertion is clearly

---

**3.** There is conflicting testimony as to when Trooper Blades found the guns belonging to Nichols. Blades testified that he discovered the guns after Nichols and Dalton were led away.

**4.** Gentry testified that the troopers asked for Hadley's consent to search the vehicle and he willingly gave it. This testimony is not contradicted by Hadley's testimony in the record. Cu-

riously, the government never mentions this fact in its Brief and does not argue consent in response to Hadley's challenge of an illegal search.

**5.** In further describing the residence, the warrant located it "at the end of an unnamed road approximately .6 miles from Brumfield Road...."

mistaken. The warrant does not specify what vehicles can be searched; it simply says "vehicles ... used to package and transport controlled substances." Any vehicle would have qualified. Defendants urge us to interpret Paragraph Eleven of Officer Todd's search warrant affidavit as limiting the types of vehicles covered in the warrant to only those owned by Young. Paragraph Eleven, however, does not require Officer Todd to limit his search to such vehicles. The section discusses "individuals who deal in large quantities of controlled substances." In a prior paragraph, Officer Todd notes that Young "would have partial payment there [in his residence], as well as several buyers." Clearly, the affidavit and search warrant covered more than vehicles belonging exclusively to Young.

Defendants also argue that the warrant did not cover vehicles detained at the edge of the property. This assertion has more merit. The warrant specifically focuses on property in and around the residence. We cannot reasonably interpret the reference to "surrounding grounds" in the warrant to include vehicles located more than a half-mile from the house. Clearly, the officers did not anticipate that buyers would arrive after they had executed their warrant; this lack of foresight does not, however, license us to stretch the scope of the warrant.

The vehicle in which defendants Gentry and Hadley rode was stopped and searched nearly a half-mile from Young's residence. Nichols' vehicle was led closer to the residence in order to hide it from other vehicles entering the farm property. It is unclear from the testimony how close it was to the residence when it was searched. Nonetheless, forcibly leading a vehicle from a place outside the scope of the warrant to a place within its territorial coverage does not make its search permissible under the warrant.

Because we find that the warrant did not cover vehicles at the perimeter of Young's farm property, we need not address appellants' third contention that the warrant did not permit the search of vehicles arriving several hours after the warrant's execution.

**B. Probable Cause and Consent to Search**

■ Although the warrant did not permit the search of the two vehicles, the officers had probable cause to believe that the vehicles carried evidence of illegal activity. *Arkansas v. Sanders*, 442 U.S. 753, 760, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979); *United States v. Barbin*, 743 F.2d 256, 259 (5th Cir.1984). Before the arrival of the defendants on Young's property, officers had arrested a number of individuals and had confiscated numerous firearms. Young had indicated that more purchasers with cash would be arriving. Young's property was located in a remote rural area. Officer Todd intercepted several telephone calls on Young's line after Young's arrest, indicating that other purchasers were en route. These facts are sufficient to afford the officers probable cause to believe that the two vehicles may have contained guns or large sums of money.

As further support for the legality of the search of Nichols' vehicle, defendant Dalton, the driver, signed a written Consent to Search form. Her signature was voluntarily given, and she does not dispute this fact. Defendant Nichols, however, attempts to challenge the voluntariness of Dalton's consent: by failing to give Miranda warnings prior to soliciting consent to search from Dalton, the officers are said to have exercised a kind of inherent coercion over Dalton's actions. We have rejected this argument on several occasions. *United States v. D'Allerman*, 712 F.2d 100, 104 (5th Cir.1983); *United States v. Garcia*, 496 F.2d 670, 674–75 (5th Cir.1974); *United States v. Horton*, 488 F.2d 374, 381 (5th Cir.1973). In *Horton*, we held an omission of Miranda warnings before a search of certain suspects' vehicle did not make their consent to the search invalid. Rather, the omission "is only one consideration in assessing voluntariness." 488 F.2d

at 381. Here, as in *Horton*, there is no evidence in the record that officers intimidated or coerced consent for the search.[6]

## II. Search of Defendants

██ Trooper Cowart conducted a pat-down search of the three persons in the Cadillac, recovering $500 from Gentry and $5,000 from Baudoin. Hadley, the driver, had no money. Defendants Hadley and Gentry challenge the legality of this search. The warrant did not cover the search of any persons, and defendants contend that Trooper Cowart lacked probable cause to search them.

Trooper Cowart sprang from his truck and aimed at Hadley's vehicle when he perceived that the vehicle was fleeing.[7] An attempt to flee from a scene where a large drug transaction has occurred, combined with the fact that Young had notified the officers that more purchasers would be arriving, gave Trooper Cowart the requisite probable cause to arrest Hadley and Gentry. The occupants were searched incident to their arrest. Although Trooper Cowart did not formally announce that the defendants were under arrest, he pulled them from the vehicle at gunpoint and made them lean against it. This detention constituted an arrest, and the search of their persons incident to it was thus legal. *See United States v. Hernandez*, 825 F.2d 846, 852 (5th Cir.1987).

## III. Conspiracy Issue

██ Defendants Dalton and Nichols challenge the sufficiency of the evidence to convict them of a *single* conspiracy to possess and distribute marijuana. The government has portrayed the transaction as one large buy to which many parties knowingly contributed. Young was facilitating the purchase of a large quantity of marijuana and needed numerous buyers to "make up the kitty." These defendants both deny any knowledge of the drug transaction; in addition they argue that, even if the government had sufficient evidence to convict them of a conspiracy to buy marijuana, the evidence did not support conviction of them as co-conspirators in the large transaction that Young had arranged.

Whereas much circumstantial evidence here suggests that defendants knowingly participated in a common plan to pool money for purchasing marijuana from Young, Baudoin's testimony at trial does much to undercut the government's characterization of a common plan to pool resources to make a larger drug buy from government agents.[8] Although the evidence at trial raises a serious question as to whether multiple conspiracies existed as a matter of law, we conclude that even if a variance is shown no substantial harm was suffered by the defendants. In order for a variance to warrant reversal, it must affect the substantial rights of the accused. *Kotteakos*

---

6. Defendant Nichols also argues that Dalton lacked authority to give consent for the vehicle search. Dalton was driving the vehicle when she and Nichols were apprehended. Nichols never made an attempt to identify himself as the owner or to remove Dalton from control over the vehicle. Under these facts, Dalton had the requisite authority to consent. *United States v. Baldwin*, 644 F.2d 381, 383 (5th Cir.1981).

7. Trooper Cowart testified at trial that as he "pulled in behind them, the driver, Mr. Hadley, put the Cadillac in reverse and backed into my truck. When he backed into my truck, he put it in forward, cut his wheels to the left and started to go forward. And I—I perceived that they were trying to flee the scene."

8. Baudoin's testimony clearly suggests that Young, Hadley, Gentry, Nichols, Dalton and Baudoin were involved in a conspiracy to possess *a unit* of marijuana. Baudoin never says, however, that Hadley or Gentry told him there would be other buyers at Young's residence. Rather, Baudoin was surprised to see others present:

Q. Would you describe the farmhouse as it appeared when you arrived.

A. ... [w]e proceeded in toward the farmhouse. There was a whole lot of cars there. I asked him what's going on, why there was so many cars, I wasn't aware there was a party going on.

Trial Rec., 2nd day, pp. 183–84.

When asked why he had a weapon, Baudoin responded that he was afraid of getting ripped off by Hadley and Gentry. Trial Rec., 2nd day, pp. 186–89. He never intimates that he came armed to protect himself against others who would be present.

*v. United States*, 328 U.S. 750, 756, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946).

In *Kotteakos*, one individual, the "hub," made fraudulent applications for loans under the National Housing Act on behalf of eight individuals, the "spokes." All were tried on the theory of a single conspiracy to defraud the government. Only the hub, however, had participated in each of the separate conspiracies.

> The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with [the hub] and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan.

*Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947) (elaborating on the rationale in *Kotteakos*).

Underscoring the substantial right "not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others as shown [in the] record," the Supreme Court found in *Kotteakos* that the parties suffered prejudice to their substantial rights from the "dangers of transference of guilt from one to another across the line separating conspiracies." 328 U.S. at 774–75, 66 S.Ct. at 1252–53.

This "transfer of guilt" is not to be feared, however, in the case before us today. As for defendants Nichols, Dalton, Gentry, Hadley and Young, substantial evidence at trial demonstrated that they "did knowingly and intentionally conspire to possess with intent to distribute marijuana," as charged in the indictment. They clearly conspired to possess a thirty-pound unit of marijuana.[9] Their conviction for this illegal activity could not have been prejudiced by the transfer of guilt from others at trial because there were *no others* at trial. All other parties listed in the indictment had plea-bargained before trial. The danger that guilt will be transferred between a group of co-conspirators being tried *en masse* and among individuals participating in separate conspiracies disappears when no evidence at trial is presented to convict the separate conspirators, only those being tried.

### IV. Government Overreaching and Entrapment

A trial judge need only instruct the jury on defenses that are fairly presented by the evidence. We review *de novo* a decision by a trial judge not to offer a "theory of defense" requested by a party. At trial, Young requested that the jury be instructed on two defenses: 1) entrapment and 2) government overreaching. Although his appeal primarily emphasizes support for giving the overreaching defense, he also contests, in passing, the judge's failure to instruct the jury on entrapment. We will address it first.

#### A. Entrapment

Defendant Young argues that the Government improperly entrapped him: but for the Government's inducement, Young would not have committed the crime. Given the clear limitations on the entrapment defense, this argument lacks merit.

David Ard testified that prior to his first meeting with police, Young had asked him to find a source for marijuana interested in trading cocaine for marijuana. The phone call Ard made to Young informing him that he had a marijuana source did not "induce" Young to purchase the substance. Young was ready to enter the transaction as soon as he heard of a source willing to barter cocaine for marijuana.[10]

---

9. Baudoin testified that he met Hadley in a bar on the evening of July 31. Hadley asked Baudoin if he "wanted to get involved in a marijuana drug buy, that the marijuana was to be sold in units of thirty pounds at $15,000 for thirty pounds, $500 per pound. I told him I had $5,000.... And he told me that wasn't enough to enter into the agremeent to purchase and that he would call be the next day if the other two-thirds of the buy could be made." Trial Rec. 2nd day, p. 177. Hadley called Baudoin the next morning and informed him he had found the other two-thirds of the money.

10. During the initial conversation between Young and Agent Todd, Young invited Todd to his home and discussed whether or not Todd

As we stated in *United States v. Bower*, 575 F.2d 499, 504 (5th Cir.), *cert. denied*, 439 U.S. 983, 99 S.Ct. 572, 58 L.Ed.2d 654 (1978), "The Government's provision of aid, incentive, and opportunity for commission of the crime amounts to an entrapment only if it appears that the defendant has done that which he would never have done were it not for the inducement of Government operatives." In this case, Ard provided information regarding Young's willingness to buy marijuana. Young was not lured, persuaded, or induced to commit the crime; he simply pursued an opportunity offered by the government. Judge Carr did not improperly withhold this defense from the jury.

### B. Overreaching

▆ Young also urges us to determine that the Government in this case acted in an outrageous manner, thus depriving him of his Fifth Amendment due process rights. The activities complained of in his brief fall far short of the outrageous circumstances necessary to support a government overreaching defense. *See United States v. Tobias*, 662 F.2d 381, 385–87 (5th Cir.1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982).

The focus of Young's criticism is the fee paid to Ard for the services he rendered in connection with this case. Young maintains that a contingency fee was offered Ard and that this arrangement was so outrageous as to deprive him of fundamental due process. The government contests the allegation, asserting that Ard was merely reimbursed for his expenses and given a reward. Even assuming that Young's allegation of a contingency fee has merit, the propriety of such an arrangement has been upheld recently by our Court. *See United States v. Cervantes–Pacheco*, 826 F.2d 310 (5th Cir.1987). Clearly, the Government could not have "overreached" by engaging in an activity that we have sanctioned.

### V. Sufficiency of the Evidence

▆ Defendant Young challenges the sufficiency of the evidence to support his would be willing to enter a 50% cash, 50%

conviction of knowingly, intentionally and unlawfully attempting to distribute in excess of 50 kilograms of marijuana. 21 U.S. C. §§ 841(a)(1), 846. Viewing the evidence in a light most favorable to the Government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), a reasonable juror could have found beyond a reasonable doubt that Young was guilty of this violation.

Evidence showed that Young ordered 500 pounds of marijuana, pooled over $100,000 in cash to pay for the drug, intended to distribute various quantities of the drug to numerous buyers, and carried a bale of marijuana away from the undercover vehicle and toward his house. These facts adequately support a finding that Young had made a substantial step in his effort to distribute the drug.

▆ Defendants Hadley, Gentry, Dalton and Nichols also challenge the sufficiency of the evidence to support their convictions. We view the evidence in the light most favorable to the verdict of guilt, and we must affirm each conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Either direct or circumstantial evidence may be used to prove guilt, and credibility choices made by the jury deserve our deference. *United States v. Vergara*, 687 F.2d 57 (5th Cir.1982).

At trial, the Government had to demonstrate that a conspiracy existed in which each defendant knowingly participated. Although each of the defendants testified that they were not visiting Young's to participate in a drug buy, Baudoin's testimony linked each party in a common plan to purchase a unit of marijuana. The jury chose to believe Baudoin's testimony, and we must defer to that choice. On the morning of August 1, Hadley informed Baudoin that "the other two-thirds" ($10,-000) of the money to buy a unit of marijua-

collateral transaction.

na had been located. Baudoin testified that during his ride to Young's farm, Gentry made two attempts to contact "Carolyn" so that Hadley, Gentry and Baudoin could meet "Carolyn and a man" to pool their money to buy the drugs. The telephone records reveal that, in fact, three attempts were made: the first call was placed to Nichols' number, and the latter two were placed to Dalton's number. Gentry also made numerous calls on the same day to Young's residence. When Dalton and Nichols arrived at Young's farm, Nichols possessed enough money to make up two-thirds of the cash needed. Whereas direct evidence shows that Hadley and Gentry told and instructed Baudoin about the plan to buy marijuana, much indirect evidence demonstrates that Dalton and Nichols had been informed of the same plan.

Baudoin's testimony directly shows that Hadley and Gentry knowingly participated in the conspiracy to possess and distribute marijuana; and a "collocation of circumstances" serves as substantial evidence to show that Dalton and Nichols had knowledge of the same. *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.1979).

## VI. Other Issues

Defendants also contest Judge Carr's failure to offer a special jury instruction, his denial of a motion for a continuance, his permitted introduction of Baudoin's "hearsay" statements, and his denial of a motion to suppress.

### A. Special Jury Instruction

At trial, Nichols' attorney requested that the jury be given a special cautionary instruction regarding Baudoin's drug addiction. Whereas cautionary instructions regarding addiction are appropriate when not in dispute, *United States v. Ochoa–Sanchez*, 676 F.2d 1283, 1289 (9th Cir.), *cert. denied*, 459 U.S. 911, 103 S.Ct. 219, 74 L.Ed.2d 174 (1982), here, the judge noted the dispute between Baudoin and Nichols' attorney on this point. Judge Carr stated

that Baudoin "vehemently denied he is an addict and he is off of [cocaine] as a matter of fact." We do not find the decision not to give the special instruction clearly erroneous.

### B. Motion for Continuance

Young challenges the trial judge's denial of his motion for a continuance. Young retained counsel on August 1, the day of his arrest. Trial was initially set for September 22 and was reset, on September 16, for December 1. On November 26, Young retained new counsel and filed a motion for an extension of time and for a continuance. Judge Carr denied the motions and ordered that Young's prior counsel assist the new attorney throughout the trial.

Trial judges have broad discretion whether or not to grant motions for continuances. *Morris v. Slappy*, 461 U.S. 1, 11, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983). Nevertheless, circumstances beyond an attorney's control that prevent him from adequate trial preparation merit granting continuance motions on Sixth Amendment grounds. Where a substitute counsel assumes a case several days before trial, however, trial judges may refuse to grant the continuance motions. *Morris v. Slappy*, 461 U.S. 1, 5, 103 S.Ct. 1610, 1613, 75 L.Ed.2d 610 (1983) (new counsel had only six days before trial). Here, Judge Carr required Young's first attorney to assist the new counsel during trial. Clearly, refusal to grant the continuance was not an abuse of discretion.

### C. Introduction of "Hearsay" Statements

Dalton argues that the district judge improperly allowed the introduction of hearsay statements by Isaac Baudoin at trial. Federal Rule of Evidence 801(d)(2)(E) provides: "A statement is not hearsay if ... [the] statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Baudoin's state-

ments were introduced pursuant to this exception to the hearsay rule.

Dalton argues that the district judge erred in failing to conduct a "James" hearing to determine the admissibility of statements made to Baudoin by Hadley and Gentry before these were made known to the jury. She contends that there was no substantial independent evidence demonstrating her participation in or knowledge of the conspiracy.

The Supreme Court recently decided that the "bootstrapping rule" of *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) and *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) was untied when Congress enacted the Federal Rules of Evidence and, specifically, Rule 104(a). *Bourjaily v. United States*, 483 U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). In determining the preliminary facts relevant to Rule 801(d)(2)(E), a court no longer must look "only to independent evidence other than the statements sought to be admitted." 483 U.S. at ——, 107 S.Ct. at 2777, 97 L.Ed. at 150. Rather, a court "in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." *Id.*

Judge Carr had both hearsay and independent evidence of conspiratorial activity by Dalton. Accordingly, his admission of Baudoin's statements under Rule 801(d)(2)(E) were proper.

Hadley and Gentry argue that the district judge erred in not charging the jury to disregard hearsay testimony of Baudoin. Under Rule 801(d)(2)(E), however, Baudoin's testimony was not hearsay. The judge could not charge the jury to disregard that which he had properly admitted as evidence of participation in the conspiracy.

### D. Motion to Suppress

Defendant Nichols challenges Judge Carr's denial of his motion to suppress an acknowledgment he made that the money and two guns in the car belonged to him. He twice acknowledged ownership: once before he was given Miranda warnings, and once after. Judge Carr ruled that the former acknowledgment did not poison his second admission. Case law supports his ruling. In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court dispelled any authority given the "cat out of the bag" theory for suppressing admissions of the sort arising here:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

470 U.S. at 314, 105 S.Ct. at 1296.

For the reasons stated above, we AFFIRM the conviction of each appellant.