# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-KA-01776-SCT

*LENNIS J. HILL*

*a/k/a LENNIS JAMES HILL*
*v.*
*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/07/1999 |
| TRIAL JUDGE: | HON. ROBERT H. WALKER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | LISA D. COLLUMS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEWITT T. ALLRED, III |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/29/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 1/19/2001 |

**BEFORE PRATHER, C.J., McRAE AND WALLER, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. Lennis James Hill was indicted in the Circuit Court of the First Judicial District of Harrison County for the murder of Tracy Patton. The indictment was later amended to charge Hill as a habitual offender pursuant to Miss. Code Ann. § 99-19-83 (2000). After a trial, the jury returned a verdict of guilty, and Hill was sentenced as a habitual offender to life imprisonment without the possibility of parole. Having considered Hill's assignments of error on appeal, we find no error in the trial court's judgment and affirm the conviction and sentence.

## STATEMENT OF FACTS

¶2. Jaton Issac drove Lennis Hill to Tracy Patton's residence to buy crack cocaine. During the transaction, Patton was shot and later died from his injuries. Issac, who fled outside after the transaction turned sour, heard shots fired and saw Hill flee from the scene. Hill fled on foot in one direction, and Issac left by car

traveling in the opposite direction.

¶3. Nicole Pogue was sleeping in Patton's residence when she was awakened by gunshots. She testified, "I saw Tracy running through the bathroom, and I saw this man right here (pointing to Hill) following behind him." She followed Hill outside and saw him flee on foot and a female later determined to be Issac leaving in a vehicle. Even though Pogue had never seen Hill prior to the incident, she positively identified Hill as the shooter on the night in question.

¶4. Officer Alan Pohlman of the Gulfport Police Department went to Patton's residence after he received report of a shooting. By the time Pohlman reached the scene, Patton had died. After other officers arrived, a search conducted of the premises revealed two handguns, some cash and what was later determined to be crack cocaine. The gun used in Patton's murder was never recovered.

¶5. Detective Kenneth Davis testified that he was approached by a familiar individual who told him that "Capone" was the shooter. Davis later identified "Capone" to be Hill and the woman outside the house as Issac. He located and questioned Issac.

¶6. Issac, an admitted crack addict, told Detective Davis that she had only known Hill for a couple of days and knew him only by the name of "Capone." On the night in question, Issac met Hill at a gas station where he asked her for a ride. Later, Hill and Issac decided to get some cocaine at Patton's residence. Once inside, Issac and Hill negotiated with Patton. When Patton returned with the cocaine, Hill pointed a pistol at Patton and instructed him to hand it over. Patton refused and turned, running towards his bedroom. At this point, Issac became scared and ran towards the door. As she reached the door, she heard gun shots. By the time Issac reached her car, Hill came outside and directed her to pick him up down the street. According to Issac, she fled in a different direction and never saw Hill again.

¶7. A few hours after the shooting, Cotrell Holliday talked with Hill. Holliday had heard a rumor that Hill was responsible for the murder, and he asked Hill about it. Initially Hill denied any involvement, but when Holliday asked a second time, Hill responded, "Yeah, I smoked the buster."

¶8. A few days after the shooting, the patrol division of the Gulfport Police Department made a routine traffic stop. One of the passengers exited the car and began to flee. Once apprehended, the fleeing individual was identified as Hill. The officers took him into custody because they had received a bulletin that Hill was wanted for questioning.

## DISCUSSION OF LAW

### I. DID THE TRIAL COURT ERR IN DENYING HILL'S MOTION IN LIMINE TO PROHIBIT ALL REFERENCES TO HIM AT TRIAL BY HIS STREET NAME "CAPONE"?

¶9. Hill moved in limine to prohibit any references to his nickname, "Capone." The court granted the order in part and denied it in part, ordering that only witnesses who knew Hill as "Capone," and not as "Hill," could use his nickname. The State was instructed not to use the nickname for the sole purpose of drawing attention to Hill. The court refused to find prejudice in referring to Hill as "Capone," but it did grant Hill a continuing objection when witnesses used the nickname. Hill claims that by allowing witnesses to refer to him as "Capone," he was unduly prejudiced and did not receive a fair trial.

¶10. We have held, "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Gilley v. State,* 748 So. 2d 123, 126 (Miss. 1999) (citations omitted). Prejudice under these facts will not be assumed, but must be proven.

¶11. Hill contends he was prejudiced four times when the name "Capone" was mentioned at trial: twice during direct examination by the State and twice during the State's closing argument. During the State's direct examination of Detective Davis, the following exchange took place:

BY STEPHEN B. SIMPSON (Assistant District Attorney):

Q: I don't want you to go into what was said, I just want to know from what source or how did Lennis Hill first become a suspect?

BY DAVIS:

A: I was told that "Capone" was the person doing the shooting. And I later identified the person known as "Capone" as Lennis Hill.

\*\*\*\*

Q: Not at that time. What did you do subsequent to that?

A: We conducted numerous interviews with different people on the street who all subsequently gave us the same information, that "Capone" did the shooting of Tracy Patton.

Hill was not prejudiced by this exchange. The detective was merely responding to questions concerning how Hill was determined to be a suspect. Nothing in the State's questions can be interpreted as a deliberate attempt to elicit a reference to Hill by his nickname.

¶12. Hill's second claim of prejudice occurred when Issac took the stand:

BY STEPHEN B. SIMPSON:

Q: Do you know the defendant Lennis Hill?

BY ISSAC:

A: No. I knew of him.

\*\*\*\*

Q: Well, you were told who he was?

A: Yes.

Q: All right. And did you know him as Lennis Hill or some other name?

A: "Capone."

\*\*\*\*

Q: Tell us what happened.

A: ". . . Capone still hadn't got out of the car yet."

****

Q: What did you do?

: ". . . I said, Capone, please don't hurt me."

Hill argues that it is clear that Issac knew him by his birth name and had no reason to refer to his nickname, and, contrary to the trial court's direction, the State elicited a reference to Hill's nickname. However, as long as the State had a reason for bringing out the name, it did not violate the trial court's directions. Moreover, it is evident that, although Isaac knew of Hill's birth name, she "knew" Hill as "Capone."

¶13. The two references to Hill's nickname by the State during closing argument are more troublesome. First, the State, while summarizing Issac's testimony, stated, "And this man, Lennis Hill, who she knew on the street. She knew him as 'Capone,' but she knows it is Lennis Hill." Second, the State summarized Holliday's testimony as follows:

> And then Cotrell Holliday. Says he is not credible because he is 16 years old. What motive has he to make this up? What has he got to gain or lose by coming in this courtroom and out of the blue saying that man got in my car? And it was all over the street that "Capone," this guy, Lennis Hill, had done the shooting.

¶14. Before Hill can complain about the State's argument, he must first establish that he was actually prejudiced. *See Gilley*, 748 So. 2d at 127. In a similar case to the one before us, we have previously refused to find prejudicial error where the State referred to the defendant by a nickname when the trial court had cautioned the State to limit such references. In *Stringer v. State,* 477 So. 2d 1335, 1339 (Miss. 1985), defendant "Jimbo" Stringer had been convicted of capital murder when he faced another trial for aggravated assault. He had received extensive pre-trial publicity as "Jimbo" before the capital murder trial. Prior to the second trial he moved the court to limit the State from referring to him as "Jimbo." In denying the motion, the court ordered the State "to do the best it could in avoiding the designation 'Jimbo Stringer' throughout the trial." *Id.* As in the case presently before us, the State referred to Stringer by his nickname on at least four occasions. Claiming that the State made a concerted effort to bring out and draw attention to his nickname and claiming unfair prejudice, Stringer appealed his conviction. In addressing Stringer's claim, the Court noted that many of the witnesses only knew Stringer by his nickname, but nonetheless determined that during trial, the nickname was used sparingly.

¶15. Pursuant to *Stringer*, more is required to establish prejudice than merely pointing out instances where the State referred to a defendant by an undesirable nickname. During closing argument, the State referred to Hill's nickname to remind the jury of how Hill was determined to be the culprit. We find that Hill was not unduly prejudiced and that the trial court did not abuse its discretion in allowing the State to make the references to Hill's nickname. We therefore decline to find reversible error in any of the references made using Hill's nickname.

## II. DOES INSUFFICIENT EVIDENCE EXIST SUCH THAT NO REASONABLE JUROR

**COULD HAVE RETURNED A VERDICT OF "GUILTY OF MURDER?"**

### III. DID THE TRIAL COURT ERR IN NOT GRANTING HILL'S MOTION FOR A DIRECTED VERDICT, OR IN THE ALTERNATIVE, HIS MOTION FOR A NEW TRIAL?

¶16. Relying on discrepancies in the testimony of Pogue and Issac, Hill claims that the State failed to meet its burden of proof in showing that he committed the murder. Pogue's and Issac's testimony differed as to the color of Issac's car and the color of the gun. Issac also offered contradictory testimony as to what Hill was wearing when the murder was committed and the length and style of Issac's hair. Finally, Hill points to the fact that Issac is an admitted crack addict.

¶17. The standard of review for directed verdict motions requires that all evidence, including that which does not support the State's case, must be considered in the light most favorable to the State as a verdict winner. *Morgan v. State,* 703 So. 2d 832, 835 (Miss. 1997). The State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. *Id.* "If, under this standard, sufficient evidence to support the jury's verdict of guilty exists, the motion for a directed verdict . . . should be overruled." *Noe v. State,* 616 So. 2d 298, 302 (Miss. 1993) (citations omitted).

¶18. When an appeal is taken from a denied motion for JNOV, the sufficiency of the evidence as a matter of law is viewed and tested in a light most favorable to the State. *McClain v. State,* 625 So. 2d 774, 778 (Miss. 1993). The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence. *Id.* Matters regarding the weight and credibility of evidence are to be resolved by the jury. *Id.*

¶19. We have previously held, "The testimony of a single uncorroborated witness is sufficient to sustain a conviction even though there may be more than one person testifying to the contrary." *Williams v. State,* 512 So. 2d 666, 670 (Miss. 1987) (citations omitted). The Court's authority to reverse is limited to those occasions where the evidence so considered is such that no reasonable and fair-minded juror could find the accused guilty. *See McClain,* 625 So. 2d at 778.

¶20. Hill has failed to demonstrate that the verdict reached by the jury was based on legally insufficient evidence. Issac's testimony that she saw Hill pull a gun on Patton, followed shortly by the sound of a gun being fired, along with Hill's statement to Holliday that he "smoked the buster," as well as other evidence developed at trial, was more than sufficient evidence for the jury to have found Hill guilty. Although there was some discrepancy in testimony, it was well within the jury's discretion to determine whom to believe.

¶21. It is not our function to determine whose testimony to believe. *Allman v. State,* 571 So. 2d 244, 253 (Miss.1990). We will not disturb a jury's finding on conflicting testimony where there is substantial evidence to support the verdict. *Id.* Having found sufficient evidence to support the jury's verdict, this Court finds Hill's second and third assignments of error to be without merit.

### IV. DID THE TRIAL COURT ERR IN REFUSING TO GRANT HILL'S JURY INSTRUCTION, D-25?

¶22. We do not review jury instructions in isolation; rather, they are read as a whole to determine if the jury was properly instructed. *Whittington v. State,* 748 So. 2d 716, 720 (Miss. 1999). An error in one instruction will not warrant reversal if the jury was fully and fairly instructed by other instructions. The Court

assumes that juries follow the instructions given them by the trial court. *Id.* at 721.

¶23. Hill claims that the trial court erred in not granting defense instruction D-25 which reads as follows:

> The court instructs the jury that the testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.

> You should never convict any defendant upon the unsupported testimony of such a witness unless you believe the testimony beyond a reasonable doubt.

The trial court refused Hill's instruction, finding that instruction C-1 adequately instructed the jury as requested by Hill. Instruction C-1 reads in part as follows:

> As sole judges of the facts in this case, your exclusive province is to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified in this case.

¶24. Instruction D-25 related to testimony elicited from Issac, a known and admitted crack addict. In arguing that his proposed instruction should have been granted, Hill places great emphasis on an opinion by the United States Court of Appeals for the Fifth Circuit holding that cautionary instructions regarding addiction are appropriate when not in dispute. *United States v. Gentry,* 839 F.2d 1065, 1073 (5th Cir. 1988). Although Issac's addiction was not disputed, a trial court may properly refuse an instruction which is covered elsewhere in the instructions. *Heidel v. State,* 587 So. 2d 835, 842 (Miss. 1991).

¶25. The State directs the Court's attention to Miss. Code Ann. § 99-17-35 (1994): "The judge in any criminal cause, shall not sum up or comment on the testimony, or charge the jury as to the weight of evidence; but at the request of either party he shall instruct the jury upon the principles of law applicable to the case. . . ." The State argues that if the trial court were to grant the instruction proffered by Hill, it would result in an improper commenting on the weight and worth of the evidence.

¶26. A close reading of the instruction granted by the trial court reveals that the jury was properly instructed. The jury was instructed to weigh the testimony of each witness and that it was within its discretion in deciding whom to believe. Hill had adequate opportunity to cross-examine Issac about her addiction. "It is a well established that the trial court is not required to give repetitious instructions." *Higgins v. State,* 502 So. 2d 332, 334 (Miss. 1987). This assignment is without merit.

### V. DID THE STATE COMMIT PROSECUTORIAL MISCONDUCT WHEN IN CLOSING ARGUMENT, REFERENCE WAS MADE TO A STATEMENT MADE BY HILL, EVEN THOUGH HILL DID NOT TESTIFY AT TRIAL?

¶27. Prior to trial, Hill filed a motion to suppress certain statements made by him to Captain Steve Barnes of the Gulfport Police Department. Captain Barnes read Hill his *Miranda* rights, and Hill initialized that he read, understood and voluntarily waived his rights. Hill then answered Captain Barnes's questions. Towards the conclusion of the interview, another officer asked Captain Barnes to stop the interview so he could participate. The delay was less than one hour, and Hill remained in Captain Barnes's office the entire time. Once the second officer arrived, the interview was resumed. Hill was not re-*Mirandized*, and Hill did not

initial his second statement.

¶28. In denying Hill's motion to dismiss for illegally obtained evidence, the trial court determined that the second statement was simply a continuation of the first statement and that the initial *Miranda* warning was sufficient.

¶29. During closing argument, the State referred to these statements. Hill argues that a reasonable juror could have viewed these comments as a reference to the fact that Hill did not testify in his own defense, thereby violating his Fifth Amendment right against self-incrimination. As long as the State does not call the jury's attention to the accused's failure to testify at trial, a comment on his out-of-court statements, if they are in evidence, is a proper reference to matters in evidence and is not a comment on the accused's failure to testify. *See Butler v. State,* 608 So. 2d 314, 318 (Miss. 1992). We have previously held, "The prosecuting attorney may properly evaluate the weight and worth of statements given to law enforcement officers by an accused, so long as there was no suggestion about the failure to testify." *See id.* Since the voluntary statements were properly entered as evidence, Hill has no basis for arguing that his Fifth Amendment right against self-incrimination was in any way compromised. This issue is without merit.

## VI. DO CUMULATIVE ERRORS COMMITTED AT TRIAL REQUIRE REVERSAL?

¶30. Hill requests that in the event we fail to find reversible error in the other assigned issues, the Court should find the effect of cumulative errors committed at trial requires reversal. To bolster this claim, Hill cites *Jenkins v. State,* 607 So. 2d 1171, 1183 (Miss. 1992) (citing *Griffin v. State*, 557 So. 2d 542 (Miss. 1990): "This Court has often ruled that errors in the lower court that do not require reversal standing alone may nonetheless taken cumulatively require reversal."

¶31. The Court must determine "whether the cumulative effect of all the errors committed during the trial deprive the accused of a fundamentally fair and impartial trial. Where there is 'no reversible error in any part . . . there is no reversible error to the whole.'" *See Wilburn v. State,* 608 So. 2d 702, 705 (Miss. 1992) (citations omitted). Having found no reversible error in Hill's previous assignment of errors, this Court refuses to overturn his conviction based on the claim of cumulative error.

## CONCLUSION

¶32. Based on the foregoing analysis, the conviction for murder and sentence imposed by the Circuit Court of the First Judicial District of Harrison County, Mississippi, of life imprisonment without the possibility of parole is affirmed.

¶33. **CONVICTION OF MURDER AND SENTENCE AS A HABITUAL OFFENDER TO LIFE IMPRISONMENT WITHOUT POSSIBILITY OF PAROLE AFFIRMED.**

**PRATHER, C.J., PITTMAN AND BANKS, P.JJ., McRAE, SMITH, MILLS, COBB AND DIAZ, JJ., CONCUR.**