**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert BLACKMAN, Marvin Hinsey, Kenny Thompson, Salathiel Calvin Thompson, Defendants–Appellants.**

**No. 91–6112.**

United States Court of Appeals,
Eleventh Circuit.

Oct. 20, 1995.

Henry M. Bugay, Miami, FL, for K. Thompson.

Kendall Coffey, U.S. Attorney, Richard D. Boscovich, Marc Fagelson, Harriett Galvin, Linda Collins Hertz, Asst. U.S. Attys., Miami, FL, for appellee.

Geoffrey C. Fleck, Gainesville, FL, for Blackman & Hinsey.

Jill K. Traina, Coral Gables, FL, for Salathiel Thompson.

Before KRAVITCH and EDMONDSON, Circuit Judges, and EISELE *, Senior District Judge.

EDMONDSON, Circuit Judge.

In July 1990, the Coral Gables Bank and the First Union bank were robbed. Defendants were arrested in September and indicted on two counts of armed robbery and two counts of using a firearm in the commission of a felony. Defendants Kenny Thompson (Kenny), Salathiel Thompson (Salathiel), and Marvin Hinsel are from the Bahamas; defendant Robert Blackman is a United States citizen. Defendants confessed but later filed a motion to suppress the confessions, claiming they had been coerced.

At the suppression hearing before a magistrate judge[1], defendants claimed that FBI agents surrounded the apartment where Kenny and Salathiel Thompson lived, ordered all four defendants to come out with their hands up, handcuffed them, and arrested them without reading them their rights. Defendants assert that two Bahamian police officers arrived on the scene, pointed a gun at Salathiel, and threatened to kill him if he did not cooperate with the FBI. At the hearing, defendants said they were coerced into confessing by FBI agents who threatened to turn them over to the Bahamian officials if they did not admit to the robberies.

According to the government, law enforcement officials went to the Thompsons' apartment after receiving a lead from Bahamian officials which linked defendants to the robberies. No arrest warrant was obtained. The agents went to the house, not to arrest defendants, but to investigate the robberies; and they handcuffed defendants for safety reasons. According to the agents, while being handcuffed, or immediately thereafter, Salathiel Thompson asked what the agents wanted. When an agent responded "this is involving a bank robbery of the First Union Bank," Salathiel responded "O.K., I will tell you about that." At this point, Salathiel was read his rights and arrested. And, when Salathiel told the agents that the others were involved, the other defendants were read their rights and arrested. All four defendants confessed at the FBI headquarters. The agents denied that defendants were threatened by either the Bahamian police or FBI agents.

The magistrate judge recommended denial of the motion to suppress, and the district court agreed. Defendants were convicted on all charges.[2]

## I. Batson v. Kentucky:

Before voir dire began, the district judge asked the group of potential jurors if they had "compelling reasons" that would affect their ability to sit as a juror in the case. One juror, Mr. Bentley, said that he would have trouble serving on a jury because he was a deeply religious man who believed "it is wrong to judge a person because judgment belongs to God." Upon questioning from the judge, Bentley added that, if selected, he would do his best to decide the case based on the evidence but "still believed that it is wrong." Upon further questioning from the

---

\* Honorable Garnett Thomas Eisele, Senior U.S. District Judge for the District of Arkansas, sitting by designation.

1. The district court later read the entire file and record, including the hearing transcripts, and "ratified, affirmed and adopted" the magistrate judge's Report and Recommendation.

2. At trial, the court dismissed the armed robbery charge and weapons charge against Kenny Thompson arising out of the Coral Gables robbery.

prosecutor, Bentley stated that his religious beliefs would "impair [his] ability to sit in judgment in a criminal case." The court denied the government's request to strike Bentley for cause. When the government used a preemptory strike to remove Bentley, the defense raised a *Batson* challenge. The court denied the challenge and said, among other things, that defendants had failed to establish a "pattern" of racial discrimination.

▇ To establish a violation under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), defendant must present a prima facie case of purposeful discrimination by showing that the prosecution used preemptory challenges to strike a minority juror and that the circumstances raise an inference of discrimination. *United States v. Cure*, 996 F.2d 1136 (11th Cir.1993). The government must then demonstrate a racially-neutral basis for its act. Such justification need not rise to the level of a challenge for cause, but must be an articulable basis which bears some relation to the case before the court. *United States v. Williams*, 936 F.2d 1243, 1245 (11th Cir.1991). Because the trial judge is uniquely situated to evaluate the prosecutor's motives, we review the district court's determination on a *Batson* challenge under the clearly erroneous standard. *Cure*, 996 F.2d at 1138.

▇ Defendants claim the trial court misapplied the law by requiring them to show a "pattern" of discrimination. *Batson* does not require a "pattern" of discrimination, but only the drawing of an inference of racial discrimination through any means. *Williams*, 936 F.2d at 1245. While defendants correctly state the law, their argument is without effect. After defense counsel advanced the *Batson* challenge, the trial court asked for the government's reason for striking Bentley. The prosecutor answered that a "pattern" had not been shown to which the court responded, "I understand that. I

would still like to have your reasons." The prosecutor replied: "Certainly Judge. The reasons are, as we have discussed before with the court, this man stood up before any questioning began of his own volition and said, 'I cannot be fair.' " The trial court then stated that the "record is clear that [Bentley] has been, at least, ambivalent." After argument from defense counsel, the judge stated that, although he personally believed Bentley would be a fine juror, Bentley was ambivalent. Bentley was struck from the jury.

▇ Through this discussion, the trial court—at least implicitly—found that the government, in fact, had a nondiscriminatory reason for striking Bentley: his assertions during voir dire. And, based on the record of Bentley's statements, the trial court's finding is, at least, not clearly erroneous. Because the district court found that the prosecutor was motivated by a nondiscriminatory reason, we need not address the preliminary question of whether defendant established a prima facie showing nor whether the lower court truly believed (incorrectly) that defense counsel was required to show a pattern of discrimination *See Cure*, 996 F.2d at 1138.[3]

## II.   *Motion to Suppress:*

Defendants contend that their confessions flowed from unlawful arrests. That the government lacked probable cause when FBI agents called defendants out of the apartment and handcuffed them is undisputed by the parties. Defendants claim that their detention constituted an arrest because, under the circumstances, a reasonable person would not have believed he was free to walk away. *See United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). So, defendants argue their confessions should have been suppressed as the product of an illegal arrest.

---

**3.** Juror McNaughton refused to answer a juror questionnaire and stated that her husband was a drug dealer and that she had gone to jail for possessing a handgun. The judge granted the government's motion to strike her for cause.

Defendants claim the district court violated *Batson*. But, no authority suggests *Batson* extends to the area of challenges for cause. In any

event, the district court made a clear finding that McNaughton was struck because of her attitude. The decision to exclude a juror for cause is within the sound discretion of the trial judge. *United States v. Taylor*, 554 F.2d 200, 202 (5th Cir.1977). Given McNaughton's acts during voir dire, the district court did not abuse its discretion.

■ The government argues that the detention was an investigatory detention and did not become an arrest until defendant Salathiel made incriminating statements, at which time the government had probable cause and defendants were arrested and informed of their *Miranda* rights. Absent probable cause to make an arrest, law enforcement officials may briefly detain a person as part of an investigatory stop if they have a reasonable articulable suspicion based on objective facts that the person has engaged in criminal activity. *United States v. Diaz–Lizaraza*, 981 F.2d 1216, 1220 (11th Cir.1993). Reasonable suspicion requires more than a hunch; it requires that the totality of the circumstances create, at least, some minimal level of objective justification for the belief that the person engaged in unlawful conduct. *Id.* at 1221.

The reasonableness of the officers' conduct must be judged against an objective standard: "would the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), *cited in Courson v. McMillian*, 939 F.2d 1479, 1493 (11th Cir. 1991).

■ In this case, the FBI agents had a reasonable suspicion that the occupants of the apartment committed the two bank robberies. Bahamian officials contacted the FBI about a reliable informant who claimed his friends had committed the robberies. The informant gave a description of the people which matched descriptions given by witnesses to the robberies. On the day of the arrest, the informant met with Agent Boyle, repeated his allegations, and gave Boyle the suspects' address. Agents conducting surveillance at the residence saw a black male matching the description given by the informant go into the apartment. This evidence was sufficient to give the agents a reasonable suspicion to believe defendants were involved in the bank robberies and to conduct an investigatory stop.

■ No brightline test separates an investigatory stop from an arrest. Instead, whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances. *United States v. Roper*, 702 F.2d 984, 985 (11th Cir.1983). We have concentrated on the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts relied upon by the officers. *See Courson*, 939 F.2d at 1492. In addition, this Court has said the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest. *See United States v. Kapperman*, 764 F.2d 786, 790 n. 4 (11th Cir.1985); *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir.1989).

■ Defendants claim their detention from their point of view was unreasonably intrusive because, under the circumstances, a reasonable person would not believe he was free to leave. But, *an investigatory stop is not an arrest despite the fact that a reasonable person would not believe he was free to leave. Id.*

That the agents initially went to the apartment to talk with the residents and not to arrest them is undisputed. And, the agents testified that they asked defendants to come out of the apartment because the agents did not know how many people lived in the apartment and because the residents were suspected of participating in an armed bank robbery during which shots were fired. (One of the guns used in the robbery appeared to be an automatic weapon.) In the light of the violent nature of the robberies, of the number of suspects (four adult males) involved, and of the agents' need to protect themselves, the agents' act of calling for defendants to come out of the apartment and handcuffing them once they were out of doors was not unreasonable. *See Hastamorir*, 881 F.2d at 1557 (handcuffing reasonable to protect officer); *Kapperman*, 764 F.2d at 790 (handcuffing not unreasonable because officers must protect themselves). Caution was called for even at the investigatory stage. So, defendants' initial detention was

an investigatory stop and not an arrest.[4]

As he was being handcuffed or immediately thereafter, Salathiel Thompson made statements incriminating himself and others; and the agents placed defendants under arrest. These statements and the other evidence linking defendants to the bank robberies were sufficient to cause a reasonable person to believe that defendants committed the bank robberies. So, we affirm the district court's finding that the agents had probable cause to arrest defendants after Salathiel Thompson's statements. *See Hastamorir,* 881 F.2d at 1557 (affirming finding of probable cause based on evidence found during investigative stop).

Defendants Salathiel Thompson, Hinsey, and Blackman additionally contend that the district court should have suppressed their confessions because, after being lawfully arrested, they received no *Miranda* warnings and because the confessions were coerced. The magistrate judge specifically rejected defendants' claims. Crediting the agents' testimony, the magistrate found that all four defendants were fully advised of their *Miranda* warnings before making the oral statements and signing the written confessions. And, the magistrate rejected defendants' claims that the statements were coerced. The magistrate specifically found that Salathiel Thompson made his first inculpatory statements during the investigatory stop and before the Bahamian police arrived and found that the FBI agents reassured defendants that they would remain in federal custody and would not be turned over to the Bahamian officials. After *de novo* review of the record, the district court adopted these findings.

■ When reviewing a ruling on a motion to suppress, we review the district court's factual findings for clear error and its application of law to the facts *de novo. See United States v. Magluta,* 44 F.3d 1530, 1536 (11th Cir.1995). The district court's ultimate conclusion on the voluntariness of a confession, or the waiver of *Miranda* rights, raises a question of law to be reviewed *de novo. Beckwith v. United States,* 425 U.S. 341, 347–48, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976); *United States v. Parr,* 716 F.2d 796, 817–818 (11th Cir.1983).

After a review of the record, we agree with the district court that Defendants' confessions were made knowingly and voluntarily, after *Miranda* warnings were given. We accept that government agents did not

---

**4.** Defendants testified that they came out of the apartment after seeing FBI agents outside and hearing "Salathiel Thompson and Marvin Hinsey come out with your hands in the air." The FBI agent who made the announcement with a loudspeaker said the announcement he made was "... this is the FBI, we would like the occupants in this particular unit of this particular residence to come out the front door one by one." Another FBI agent, stationed at the front door of defendants' apartment, testified that he said "FBI, please come out, keep your hands above your head as you come out one at a time."

No one contends that, before defendants came out, FBI agents ever told defendants they were under arrest or threatened to come in after the defendants if defendants would not come out or threatened to start shooting if defendants did not come out of the apartment or even told the defendants that they had to come out within a certain time. By the way, the supervising agent testified that if defendants had refused to come out, the FBI agents might have just "gone away," considering that they had no arrest warrants.

The magistrate judge (and the district court) found that defendants voluntarily left the apartment. Once out of doors, the time that defendants were restrained without probable cause—that is, before Salathiel spoke out and defendants were told they were then under arrest—was extremely brief (a few minutes at most, "moments" says the magistrate judge). And before Salathiel spoke out, defendants were not taken or being taken to police vehicles or moved from the area in which they met the police nor had defendants been told that they would be taken away. That the use of handcuffs and the display of weapons do not, by themselves, make an investigatory stop an arrest is plain.

The facts collectively require no finding and conclusion that every reasonable person in defendants' places would conclude (in the minute or so they were restrained before Salathiel spoke) that they were under arrest, as opposed to being only briefly detained for investigatory purposes. (We assume for the sake of argument that this inquiry is essential in drawing the line between an arrest and a *Terry* stop.) The facts confirm our conclusion that the district court was correct in determining defendants were not arrested when they first met with the FBI outside of the apartment.

Because defendants chose to come out of the apartment, this case presents no issue on the rights of the government or of the defendants if defendants just had refused to come out.

threaten to turn Defendants over to the Bahamian officials, but rather told Defendants that they would be kept in federal custody. The district court did not err in denying the motion to suppress.

### III. Sentencing:

▬ Defendant Blackman faced a guideline sentence of 562 months to 627 months. At sentencing, his attorney asked the court for a low guideline sentence. The court commented on the fact that defendant Blackman had not "acknowledged some guilt, some fault." Defendant Blackman began yelling obscenities at the judge and was removed from the courtroom. The judge believed Blackman's outburst was indicative of his "absolute lack of remorse" and "complete defiance of rules" So, while the other defendants received the lowest possible sentence, the court sentenced Blackman to 627 months, the maximum sentence allowed under the guidelines.

Defendant Blackman argues that he must be resentenced because his statements provided no basis for a sentence enhancement. But, the court did not enhance the sentence; Blackman's sentence falls within the statutorily required range. The sentencing court said that it was imposing the sentence, not to punish Blackman for making the statements, but because Blackman's statements reflected his lack of remorse and refusal to accept responsibility for his acts. And, U.S.S.G. § 1B1.4 permits a judge to consider "any information concerning the background, character, and conduct of the defendant." The sentencing court did not abuse its discretion in considering Blackman's outrageous conduct at the sentencing hearing.

### IV. Sufficiency of the Evidence:

▬ Defendant Kenny Thompson argues that, while he drove the getaway car, no evidence suggests he entered the bank and used a gun. So, he claims the evidence was insufficient to convict him of using a weapon during the commission of a crime. To determine whether sufficient evidence supports the conviction, we must view the evidence in the light most favorable to the prosecution and decide whether a reasonable fact finder could have reached a conclusion of guilt beyond a reasonable doubt. *See United States v. Perez*, 922 F.2d 782, 784 (11th Cir.1991).

▬ Kenny admits to driving the getaway car, but when he confessed, he also said he "robbed the First Union Bank."[5] Reasonable jurors could have inferred from these words that he both robbed the bank and drove the getaway car. More important, two witnesses testified that four robbers entered the bank; and one of those two witnesses—Laverne Mayfield—identified Kenny as being one of the robbers inside the First Union Bank.[6] The district court did not err in admitting Ms. Mayfield's out-of-court identification through Agent Deutsch's in-court testimony under Federal Rule of Evidence 801(d)(1)(C). The Supreme Court has recognized the reliability and trustworthiness of such photospread identifications. *See United States v. Owens*, 484 U.S. 554, 561–63, 108 S.Ct. 838, 844, 98 L.Ed.2d 951 (1988) (agreeing with Advisory Committee that such identifications should be fostered not discouraged because as time passes, witnesses' memories fade); *Adail v. Wyrick*, 711 F.2d 99, 102 (8th Cir.1983) (allowing admission of pretrial identification even though witnesses could not identify defendant at trial).

▬ Defendants' convictions on all counts are AFFIRMED.[7]

---

5. Kenny's oral statement was put in writing by a government agent; Kenny then read the written statement back to the agent and then signed the form.

6. Teller LaVerne Mayfield identified both Kenny and Salathiel Thompson from a photospread as two of the four bank robbers. Mayfield could not identify Kenny at trial; but because soon after the robbery she had, from a photospread, identified both brothers as robbers, it is unlikely that she mistakenly identified Kenny instead of Salathiel at the time of the photospread identification.

7. Defendants also claim that a mistrial should have been granted because the prosecutor shifted the burden of proof to them by stating in closing argument that defendants had the power to call the Bahamian officials as witnesses. While prosecutors may not comment about the absence of witnesses or otherwise shift the burden of proof, we have said that noting that defendants have the same subpoena powers as the government is not

EISELE, Senior District Judge, concurring in part and dissenting in part:

I agree with much of what has been said by my colleagues in the majority, namely that appellants' *Batson* [1] claims are without merit; that appellants' prosecutorial misconduct and "Bahamian deposition" arguments are without merit; that appellant Blackman's sentencing argument is without merit; and that the evidence was sufficient to sustain appellant Kenny Thompson's convictions. Accordingly, I join in Parts I, III and IV of the majority's opinion. I also agree (although for reasons somewhat different from those of the majority) that the district court properly denied appellants' motion to suppress, at least as that motion related to appellants Blackman, Hinsey and Kenny Thompson, and I therefore agree with the majority that those appellants' convictions should be affirmed. Unlike the majority, however, I am forced to conclude that the district court erred in denying the motion to suppress as to appellant Salathiel Thompson, and in so far as Part II of the majority's opinion is inconsistent with this conclusion, I respectfully dissent. Further, since this error was not harmless, I must also dissent

from the majority's conclusion that Salathiel's convictions should be affirmed.

It is, of course, clear (and undisputed by the majority) that appellants were seized, within the meaning of the Fourth Amendment, after they "voluntarily" acquiesced in the officers' "request" that they exit the Thompsons' apartment, and were each then physically restrained.[2] *See California v. Hodari D.,* 499 U.S. 621, 625, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690 (1991) ("[A] seizure occurs 'when the officer, by means of some physical force or show of authority, has in some way restrained the liberty of a citizen.'") (citation and emphasis omitted). It is also conceded[3] that the officers did not have probable cause to arrest appellants until after their initial detention, *i.e.,* until Salathiel made statements incriminating both himself and the other appellants. See Maj. op. at 1574, 1575–76, 1577. What is subject to dispute, however, is whether appellants were under arrest at the time of their initial detention, which would have necessarily required probable cause (which was concededly then lacking), or whether appellants' initial detention constituted, in the eyes of the law, a

---

improper, particularly when done in response to a defendant's argument about the prosecutor's failure to call a specific witness. *See United States v. Schardar,* 850 F.2d 1457, 1463 (11th Cir.1988) (prosecutor noted that defense had same subpoena powers as government). And, even if improper, any prejudice from the prosecutor's single remark was cured by the curative instruction. *United States v. Simon,* 964 F.2d 1082, 1087 (11th Cir.1992) (curative instruction prevents prejudice from burden shifting argument).

Defendants also claim the district court erred in refusing to order the deposition of the Bahamian police officers. The district court's denial of a motion to take depositions of foreign witnesses is reviewed for an abuse of discretion. *U.S. v. Drogoul,* 1 F.3d 1546, 1552 (11th Cir. 1993). And, a court does not abuse its discretion unless the party shows that exceptional circumstances require the taking of the deposition. *Id.* Because each defendant and several agents testified about the events at the scene of the arrest, the defendants' claims of coercion were fully developed. More important, defendants failed to show that the officers would not voluntarily appear in court. Under these circumstances, the district court did not abuse its discretion.

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2. The majority accepts the lower court's finding that appellants' exited the apartment voluntarily. Maj. op. at 1576–77, n. 4. Under our precedents, I doubt seriously whether a person's exiting his home (or that of a friend) at the direction of the FBI can be deemed to be a voluntary act. *See United States v. Edmondson,* 791 F.2d 1512, 1515 (11th Cir.1986) (a defendant's opening his door at the direction of the FBI is not a voluntary act, but is rather a submission to a claim of lawful authority). I likewise doubt whether the FBI's "request" that appellants exit the apartment can be viewed as anything other than an order made under color of authority. *Cf.* 3 Wayne R. LaFave, *Search and Seizure—A Treatise of the Fourth Amendment* § 8.2(a) at 180 (2d ed. 1987) (hereinafter "LaFave"). In any event, since it is not disputed that appellants were seized immediately upon exiting the apartment, I find it unnecessary to deal with this issue head on. So, for purposes of this dissent, I accept the majority's view that appellants left the apartment voluntarily.

3. In light of the entire record, it is not immediately apparent why the government made this concession. Nevertheless, it has, and we must therefore deal with the issues raised on that basis.

*Terry*[4] or investigatory stop, which would have only required "reasonable suspicion" of wrongdoing (which I agree existed at the time of those seizures, see Maj. op. at 1576). In contrast with the majority, I believe that appellants' initial seizures fell into the former category.

In order to understand the reasons for my disagreement with the majority, it will be useful to recount the events surrounding appellants' seizures.

The record indicates that immediately prior to appellants being "asked" to exit the apartment, the apartment was surrounded by some ten to twelve FBI agents (each armed and wearing an FBI raid jacket), and that the street in front of the apartment was blocked off by several marked and unmarked law enforcement vehicles. An FBI agent then announced over a loudspeaker: "[T]his is the FBI, we would like the occupants in this particular unit of this particular residence to come out the front door one by one." A second FBI agent then shouted: "FBI, please come out, keep your hands above your head as you come out one at a time[!]" Immediately thereafter, Blackman ran out the back door with his hands in the air, at which point an FBI agent shouted: "FBI, stop[!]" Blackman complied, and he was immediately taken into custody, handcuffed, and taken to the front of the apartment and forced to lay down on the ground. Soon thereafter, the remaining three appellants exited through the front door, at which time they were all immediately taken into custody, handcuffed and placed on the ground. Salathiel then asked: "[W]hat is this about?", and was told by an FBI Agent: "[T]his is involving a bank robbery of First Union Bank back in July." Salathiel agreed to talk about that robbery, and after having been read his *Miranda*[5] rights, he made statements incriminating himself and the other appellants. The FBI agents then decided they had enough information to "formally" place appellants under arrest, and, incident to those arrests, they conducted a "protective sweep" of the Thompsons' apartment, discovering incriminating evidence (a 9mm. handgun). Appellants were then taken to the FBI's offices, and after interrogation in compliance with *Miranda,* each appellant ultimately confessed.[6]

In contrast to the majority, I believe that appellants were placed under arrest immediately after they left the apartment. Whether an appellant's detention was an investigatory stop or a full-blown arrest is a question of law subject to *de novo* review. *See United States v. Diaz–Lizaraza,* 981 F.2d 1216, 1220–22 (11th Cir.1993). This Court has previously stated that "[i]n determining 'when' a person is arrested, we ask at what point, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed he [she] was not free to leave.'" *United States v. Hastamorir,* 881 F.2d 1551, 1556 (11th Cir.1989) (quoting *United States v. Hammock,* 860 F.2d 390, 393 (11th Cir. 1988)); *see also United States v. Vargas,* 643 F.2d 296, 298 (5th Cir. Unit B. Apr. 1981);[7] 2 John Wesley Hall, Jr., *Search and Seizure* § 22:3 at p. 87 (2d ed. 1993). Strictly speaking, this particular formulation of the standard for determining whether an arrest has occurred is not a completely accurate statement of the law, for, as the majority correctly points out, "an investigatory stop is not an arrest despite the fact that a reasonable person would not believe he is free to leave." Maj. op. at 1576 (citing *United States v. Hastamorir, supra,* 881 F.2d at 1556) (emphasis omitted). This is so because even during an investigative stop, which by definition is not an arrest, it would be clear to a reasonable person so detained that he was not free to leave during the stop. *See* 2 LaFave, *supra,* § 5.1(a) at 393 (1994 Supp. at

---

**4.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**5.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**6.** Like the majority, I have no difficulty concluding that appellants' stationhouse confessions were obtained in harmony with their Fifth and

Sixth Amendment rights. See Maj. op. at 1577–78.

**7.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the prior Fifth Circuit decided prior to October 1, 1981.

135). It appears that this Court's unfortunate articulation of the "reasonable person/free to leave" test for judging arrests resulted from collapsing the *Royer–Mendenhall* [8] standard for judging when a "seizure" occurs into the test governing when such a seizure qualifies as an arrest. [9] See *United States v. Hammock, supra,* 860 F.2d at 393 (stating that an arrest occurs when " 'a reasonable person would have believed he was not free to leave.' ") (quoting *United States v. Mendenhall, supra,* 446 U.S. at 554, 100 S.Ct. at 1877 (Stewart & Rehnquist, JJ., concurring)). Of course, whether a seizure has occurred and whether an arrest has occurred are separate and distinct inquiries, the latter class of detention being a subset of the former. See 2 LaFave, *supra,* § 5.1(a) at 392–93; Richard A. Williamson, *The Dimensions of Seizure: The Concepts of "Stop" and "Arrest",* 43 Ohio St.L.J. 771, 802–17 (1982) (hereinafter "Williamson"). So, what is the appropriate standard for judging whether an arrest has occurred, as opposed to a mere investigatory stop?

Unlike the majority, I am not ready to abandon the "reasonable person" standard for judging when a detention ripens into a full-blown arrest. I have no quarrel, however, with the majority's observation that "[n]o brightline test separates an investigatory stop from an arrest," and that consequently the question whether a seizure constitutes an arrest is one that can only be answered on a case-by-case basis in light of "all the circumstances." Maj. op. at 1576.

In my view, an arrest occurs whenever a reasonable person " 'would have understood the situation to constitute a restraint on freedom of movement of the degree ... [ordinarily] associate[d] with [a] formal arrest.' " *United States v. Corral–Franco,* 848 F.2d 536, 540 (5th Cir.1988) (quoting *United States v. Bengivenga,* 845 F.2d 593, 596 (5th Cir.), *cert. denied,* 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988)); see George E. Dix, *Nonarrest Investigatory Detention in Search and Seizure Law,* 1985 Duke L.J.

849, 927 (hereinafter "Dix"); *accord Berkemer v. McCarty,* 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984) (a person is "in custody" for *Miranda* purposes when he is "subjected to the restraints comparable to those associated with a formal arrest"). Stated another way, the inquiry is simply whether a reasonable person would have believed that he was "under arrest" (as that term is commonly understood) at the time of his seizure. *United States v. Patterson,* 648 F.2d 625, 632 (9th Cir.1981); see generally Williamson, *supra,* 43 Ohio St.L.J. at 815–16. Thus, if the circumstances surrounding a seizure would be viewed by a reasonable person as indicating that he would not be free to leave *for an indefinite, or for an extended period of time,* then that person has been placed under arrest. See 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 3.8 at 297 (1984) ("[A] stopping differs from an arrest not in the incompleteness of the seizure but in the brevity of it."); *cf. United States v. Sharpe,* 470 U.S. 675, 684–86, 105 S.Ct. 1568, 1574–75, 84 L.Ed.2d 605 (1985) (noting that an investigative stop implies a "temporary" detention, typically of short duration); *Terry v. Ohio, supra,* 392 U.S. at 26, 88 S.Ct. at 1882 (noting that an arrest implies "future interference with the individual's freedom of movement" beyond that attendant with an investigative stop); *United States v. Mosquera–Ramirez,* 729 F.2d 1352, 1356 (11th Cir.1984) (recognizing this temporal distinction between arrests and investigative stops). It is not the actual length of time of the detention that is the key here, but, rather, whether a reasonable person would *perceive,* while detained, on the basis of the totality of the circumstances (including, very importantly, the actions and representations of the seizing officers, see *United States v. Brunson,* 549 F.2d 348, 358 (5th Cir.), *cert. denied,* 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107 (1977)), that he is "under arrest" as commonly understood, in that he is likely to be detained for an indefinite or extended period of time. An arrest can oc-

---

8. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

9. I note that this Court is not the only one to have fallen prey to this type of error. See, *e.g., United States v. Benjamin,* 995 F.2d 756, 759 (7th Cir.1993); *United States v. Maez,* 872 F.2d 1444, 1450 (10th Cir.1989).

cur in an instant. An officer can put his hand on a person and state that that person is "under arrest." *See United States v. Moreno,* 897 F.2d 26, 31 (2d Cir.), *cert. denied,* 497 U.S. 1009, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990); *cf. California v. Hodari D., supra,* 499 U.S. at 626, 111 S.Ct. at 1550–51 (At common law, "[a]n arrest require[d] *either* physical force ... *or,* where that was absent, *submission* to the assertion of authority."). An arrest can also occur in an instant, as here, even if the officers do not use that magic phrase.[10] *Cf. United States v. Setzer,* 654 F.2d 354, 357 (5th Cir. Unit B. Aug. 1981), *cert. denied,* 459 U.S. 1041, 103 S.Ct. 457, 74 L.Ed.2d 609 (1982).

It may be argued that the standard of "a reasonable person believing he is under arrest" will have its own difficulties, see Dix, *supra,* 1985 Duke L.J. at 929–31, but I submit that the common man or woman in this country, using common sense, understands this concept. Ordinarily, when a highway patrolman stops and detains a person for speeding, that person would not reasonably believe he or she is under arrest. *See Pennsylvania v. Mimms,* 434 U.S. 106, 109–12, 98 S.Ct. 330, 332–34, 54 L.Ed.2d 331 (1977) (police ordering a driver out of a vehicle following a traffic stop does not result in an arrest). Similarly, if an officer stops a person on the street and states: "I just want to ask you some questions," that person would not, at that moment, reasonably believe that he or she is under arrest. *See Florida v. Rodriguez,* 469 U.S. 1, 5–6, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984) (such an encounter is not even a "seizure" under the Fourth Amendment). But if an armed officer, wearing a raid jacket, violently seizes a person, forces him to the ground, and places him in handcuffs (or other restraints), would not that person reasonably believe he was under arrest? Of course he would. *Cf. United States v. Tookes,* 633 F.2d 712, 715 (5th Cir. Unit B. 1980). The difference, I suggest, is that in the first two examples the totality of the circumstances would lead the person detained to believe that his detention would be brief, whereas in the last example there is nothing in the situational context that would lead him to reasonable believe that he would soon or very shortly be permitted to leave and go on about his business.

In harmony with our prior decisions, I agree that when weighing the various factors that may distinguish an investigative stop from an arrest, *e.g.,* the number of officers present, the officers' show of force, and the use of physical restraints, see *United States v. Hammock, supra,* 860 F.2d at 393, such an inquiry must, in the end, be guided by " 'common sense and ordinary experience.' " *United States v. Hastamorir, supra,* 881 F.2d at 1556 (quoting *United States v. Espinosa–Guerra,* 805 F.2d 1502, 1509 (11th Cir. 1986)) (further citation omitted). And in my "common sense" view, when an individual is directed to leave his house (or that of a friend) by the police, is then immediately handcuffed by armed officers, and is forced to lie down on the ground in the presence of almost a dozen FBI agents wearing raid jackets, in a neighborhood that has been cordoned off by marked and unmarked police vehicles, such a person could not reasonably believe that he would, soon or shortly, be free to leave, and, therefore, he would reasonably believe that he has been subject to an arrest, rather than a mere investigatory stop.[11] *See United States v. Hawkins,* 59 F.3d 723, 727 (8th Cir.1995) (suspect under arrest when removed from his bedroom and handcuffed in the hallway); *United States v. Morgan,* 743 F.2d 1158, 1164 (6th Cir.1984) (suspect under arrest when ordered to exit

---

10. And, of course, if an arrest has in fact occurred, it cannot be "erased" by a later statement or acknowledgement that the person seized is free to go. *See Hayes v. Florida,* 470 U.S. 811, 816, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985).

11. The Seventh Circuit has recently commented that "[t]he last decade 'has witnesses a multifaceted expansion of *Terry* ' " and in the context of distinguishing between arrests and investigatory

stops, "[f]or better or for worse, the trend has led to the permitting of ... measures of force more traditionally associated with arrest than with investigatory detention." *United States v. Tilmon,* 19 F.3d 1221, 1224–25 (7th Cir.1994) (quoting *United States v. Perdue,* 8 F.3d 1455, 1464 (10th Cir.1993)). This trend is unfortunate, as it may suggest that the judiciary has not been as vigilant as it should be in guarding against the erosion of our constitutional rights.

his house by several police officers who had surrounded his house), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985); *United States v. Williams,* 630 F.2d 1322, 1324 (9th Cir.) (same under similar facts), *cert. denied,* 449 U.S. 865, 101 S.Ct. 197, 66 L.Ed.2d 83 (1980); *see also Oliveira v. Mayer,* 23 F.3d 642, 645–46 (2d Cir.1994) (suspect under arrest when he was handcuffed by armed officers after being told to exit his vehicle), *cert. denied,* —— U.S. ——, 115 S.Ct. 721, 130 L.Ed.2d 627, *and cert. denied,* —— U.S. ——, 115 S.Ct. 722, 130 L.Ed.2d 627 (1995); *United States v. Anderson,* 981 F.2d 1560, 1565–66 (10th Cir.1992) (same under similar facts); *United States v. Del Vizo,* 918 F.2d 821, 824–25 (9th Cir.1990) (same); *United States v. Gentry,* 839 F.2d 1065, 1070 (5th Cir.1988) (same). While I agree that an arrest does not necessarily and automatically result only from the use of physical restraints (*e.g.,* handcuffs), *United States v. Hastamorir, supra,* 881 F.2d at 1557; *United States v. Kapperman,* 764 F.2d 786, 790 n. 4 (11th Cir.1985), or only from the officers' show of force (*e.g.,* drawing their weapons), *United States v. Roper,* 702 F.2d 984, 988 (11th Cir.1983), it cannot, in my view, be seriously doubted that these factors, when used in conjunction, would ordinarily lead a reasonable person to believe that he is under arrest, *cf.* 2 LaFave, *supra,* § 5.1(a) at 390–91; 3 *id.* § 9.2(d) at 366–67, especially when such a seizure follows directly on the heels of an official directive, or even a "request," to leave the sanctuary of one's home. Indeed, there was nothing qualitatively different in the nature of appellants' detention at the moment they were first seized than when they were "formally" placed under arrest.

The only distinction that existed was that the officers subsequently developed probable cause to support the arrests (which fact, of course, cannot be bootstrapped to somehow alter or justify the nature of the initial seizures). Thus, under the majority's view, an arrest here, under the Fourth Amendment, would only occur when the police recite the magic words, "You are now under arrest," or perhaps after the passage of a considerable period of time. Such a result is plainly inconsistent not only with the precedent of the Supreme Court, *Dunaway v. New York,* 442 U.S. 200, 212–13, 99 S.Ct. 2248, 2256–57, 60 L.Ed.2d 824 (1979) (whether a suspect was told that he was "under arrest" is irrelevant to determining whether he was, in fact, under arrest), but with the decisions of our Court as well. When it is clear, as in the present case, that the officers have resorted to such restrictive seizures of individuals (handcuffing them at gunpoint) in order to investigate their suspicions of prior criminal activity, we have recognized that the detention of the suspects is sufficiently serious to constitute an arrest requiring probable cause, even if the officers did not formally advise the suspects that they were "under arrest" (or even if the officers did not intend to effect a "formal" arrest).[12] *United States v. Diaz–Lizaraza, supra,* 981 F.2d at 1221–22; *see also United States v. Vargas, supra,* 643 F.2d at 298. I simply find it difficult to understand how the majority could conclude that a reasonable person would not believe that he was under arrest if he were subjected to a seizure under the circumstances of this case.

**12.** In arguing for a contrary conclusion, the majority places great weight on the fact that, at the time of appellants' initial seizures, the officers subjectively intended only to question them (rather than arrest them). Maj. op. at 1576. Accepting that the officers' account of their intentions was true, their subjective intent is nevertheless irrelevant to the "reasonable person" inquiry, since there is absolutely no evidence to suggest that appellants were ever apprised of the officers' subjective intentions. *See Michigan v. Chesternut,* 486 U.S. 567, 575 n. 7, 108 S.Ct. 1975, 1979 n. 7, 100 L.Ed.2d 565 (1988) (citing authorities).

The majority also places great weight on the fact that the officers' actions were necessary to protect their safety (given that appellants were

suspected armed bank robbers). Maj. op. at 1576–77. I too share this concern. However, in the context of a *Terry* stop, officers are ordinarily permitted only to take the least intrusive steps reasonably necessary to protect themselves, *see Florida v. Royer, supra,* 460 U.S. at 500, 103 S.Ct. at 1325–26 (opinion of White, J.); Wayne R. Lafave, *Seizures Typology: Classifying Detention of the Person to Resolve Warrant, Grounds, and Search Issues,* 17 Mich.J.L.Reform 417, 434–36 (1984); *cf. United States v. Diaz–Lizaraza, supra,* 981 F.2d at 1221, and under the facts of this case I see no reason why the officers' concern that appellants were armed could not have been abated by a simple *Terry* frisk, rather than the severe measures they chose to employ.

Having concluded that appellants, on the undisputed facts, were, as a matter of law, under arrest at the time of their initial seizures, I must also conclude that those arrests were unlawful, in that it has been conceded that those seizures were not supported by probable cause. See *United States v. Hastamorir, supra,* 881 F.2d at 1556 (arrest must be supported by probable cause); *United States v. Espinosa–Guerra, supra,* 805 F.2d at 1506 (same). Thus, it follows that any evidence obtained as a result of appellants' unlawful seizures must be suppressed as "fruit of the poisonous tree." See *Wong Sun v. United States,* 371 U.S. 471 (1963). Following his initial seizure, *i.e.,* arrest, Salathiel made various statements incriminating himself and the other appellants, and, in so far as those statements relate to the government's case against Salathiel, those statements should have been suppressed.[13] Likewise, since it was only those statements that gave rise to the probable cause necessary to sustain Salathiel's (and the other appellants') arrest, and thereby support the "protective sweep" of the apartment [14] and his detention at the FBI's offices, Salathiel was entitled to the suppression of any evidence discovered from the apartment (the .9mm handgun), *see United States v. Satterfield,* 743 F.2d 827, 843–47 (11th Cir.1984), *cert. denied,* 471 U.S.

1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985), as well as his later confession. *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

While I recognize that the government had other evidence linking Salathiel to these crimes (namely fingerprint evidence [15] and eyewitness testimony placing him at the scene), this evidence, though strong, was not overwhelming, and Salathiel's confession was obviously a critical piece of the government's case against him. Therefore, I cannot conclude that the erroneous admission of Salathiel's confession was harmless. *See United States v. Gomez,* 927 F.2d 1530, 1536–39 (11th Cir.1991). Accordingly, I conclude that Salathiel's convictions should be reversed. To the extent the majority's opinion is inconsistent with this conclusion, I respectfully dissent.

---

**13.** Of course, since the remaining appellants lack standing to challenge Salathiel's illegal seizure, *United States v. Powell,* 929 F.2d 1190, 1194–96 (7th Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991); 4 LaFave, *supra,* § 11.3(a) at 282 (1994 Supp. at 68), they were not entitled to the suppression of those statements. *United States v. Payne,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). Since those statements gave rise to the probable cause necessary to sustain their arrests, and as no evidence was obtained from those appellants during the period surrounding their illegal seizures, it follows that all the evidence that was later obtained was properly admitted against those appellants. *United States v. Walker,* 535 F.2d 896, 898–99 (5th Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976).

**14.** Such a protective sweep may only be conducted following a lawful arrest based on probable

cause, provided the officers have reasonable suspicion to believe that danger lurks within the residence. *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *United States v. Hromada,* 49 F.3d 685, 690 (11th Cir. 1995).

**15.** The record does not indicate whether Salathiel's fingerprint exemplars were obtained as a result of his illegal arrest, in which case the government's fingerprint evidence would have to be excluded, *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), or whether they were obtained from an independent source, and were hence admissible. See *United States v. DeSimone,* 660 F.2d 532, 542–43 (5th Cir. Unit B. Nov. 1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 *and cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982).